**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------- X

ALYSA   OCASIO,   ANDREW   OCASIO,   and
JAHAIRA HOLDER, as Administratrix of the Estate
of Sandy Guardiola,

                                        Plaintiffs,

         - against -

The CITY OF CANANDAIGUA, a municipal entity;
Canandaigua Police Chief STEPHEN HEDWORTH,
in his individual and official capacities; Canandaigua
Police Sergeant SCOTT KADIEN, in his individual
capacity;      DOCCS      Parole     Chief     DAWN
ANDERSON, in her individual capacity; DOCCS
Senior Parole Officer THOMAS O'CONNOR, in his
individual capacity; DOCCS Senior Parole Officer
BETH HART-BADER, in her individual capacity;
GRAND ATLAS PROPERTY MANAGEMENT,
LLC,       formerly      known      as      MORGAN
MANAGEMENT LLC, a domestic Limited Liability
Company;        MORGAN          COMMUNITIES
MANAGEMENT, LLC ("Morgan Communities"), a
domestic Limited Liability Company; PINNACLE
NORTH I LLC ("Pinnacle"), a foreign Limited
Liability Company; and JOHN and JANE DOE #1
and #2, employees of GRAND ATLAS, MORGAN
COMMUNITIES, and/or PINNACLE,

                                        Defendants.

-------------------------------------------------------------------------- X

**COMPLAINT**

No.

**JURY TRIAL**

     ALYSA OCASIO, ANDREW OCASIO, and JAHAIRA HOLDER, as Administratrix of

the Estate of Sandy Guardiola, by their attorneys, Beldock Levine & Hoffman LLP, as and for

their Complaint, allege as follows:

## PRELIMINARY STATEMENT

    1.    This is a civil rights action brought by the family and the estate of Sandy

Guardiola, a New York State Parole Officer shot and killed in her bed by Canandaigua Sergeant Scott Kadien. Her death was caused by flagrant violations of her constitutional rights, and the subsequent reaction by City, State, and County officials, including the District Attorney, in falsely and maliciously vilifying her rather than representing her interests, is cause for outrage.

2.      Ms. Guardiola served in law enforcement for 20 years. In 2015, she joined the New York State Department of Corrections and Community Supervision as a Parole Officer. In 2017, she transferred first to the Rochester Office and, thereafter, to the Binghamton Office.

3.      After a car accident put her on out medical leave for one month, on October 4, 2017, Ms. Guardiola hoped to begin work at a new office in Binghamton. However, due to delayed paperwork, Ms. Guardiola remained on medical leave.

4.      For reasons not yet fully known, on October 4, 2017, a Parole supervisor from the Rochester office (not her new office in Binghamton) called 911 for a wellness check.

5.      Canandaigua Police Sergeant Scott Kadien responded to the call for a wellness check. Upon arriving at Ms. Guardiola's address, he entered her locked apartment. He then opened her closed bedroom door. Without lawful justification, and while she was still in her bed, Kadien then shot Ms. Guardiola in the arm, head, and abdomen, ultimately killing her.

6.      Rather than summon the emergency medical personnel who were stationed across the street from Ms. Guardiola's apartment complex, Kadien called for more law enforcement personnel to respond to the scene of this deadly shooting. When law enforcement officials arrived, upon information and belief, they conspired to cover up Kadien's actions for approximately 10 minutes prior to calling for the emergency medical responders to render aid to Ms. Guardiola who had been shot in her bed three times.

7.      The apartment was run by Pinnacle North I LLC ("Pinnacle North") and managed

by Morgan Communities Management, LLC ("Morgan Communities") and Grand Atlas Property Management, LLC ("Grand Atlas"), formerly known as Morgan Management LLC. Two employees of Pinnacle North, Morgan Communities, and/or Grand Atlas improperly allowed Kadien into the building and into Ms. Guardiola's apartment, precipitating the events that led to her death.

8.      Ms. Guardiola's family and estate now seek redress under 42 U.S.C. § 1983 and New York State law for the injuries caused by the unconstitutional conduct of the City and State officials. They also seek to hold the apartment complex accountable for the actions of its employees.

9.      Plaintiffs seek (i) compensatory damages for physical injury, psychological and emotional distress, and financial loss caused by the illegal actions of the Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including costs and attorneys' fees, as this Court deems equitable and just.

## JURISDICTION AND VENUE

10.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and, as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights, is brought under 42 U.S.C. § 1983.

11.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

3

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as this is the judicial district in which the Defendant City of Canandaigua and Defendants Pinnacle, Morgan Communities, and Morgan Management maintain their principal places of business.

## JURY DEMAND

13.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## THE PARTIES

### Plaintiff

14.     SANDY GUARDIOLA was a 48-year-old mother of two who, at the time of her death on October 4, 2017, resided at Pinnacle North Apartments, 20 North Shore Boulevard, Canandaigua, New York 14424. She was a citizen of the United States, the State of New York, and resided in Ontario County.

15.     Plaintiff ALYSA OCASIO is the daughter of Sandy Guardiola. She is a citizen of the United States and of the State of New York and resides in Westchester County.

16.     Plaintiff ANDREW OCASIO is the son of Sandy Guardiola. He is a citizen of the United States and of the State of New York and resides in Westchester County.

17.     Plaintiff JAHAIRA HOLDER was appointed by the Surrogate's Court of Ontario County as the Administratrix of Ms. Guardiola's Estate for purposes of this litigation. She is a citizen of the United States and of the State of New York and resides in New York County.

### Defendants

18.     The CITY OF CANANDAIGUA (the "City") is a municipal entity created and authorized under the laws of the State of New York.

19.     The City is authorized by law to maintain a police department, and does maintain the CANANDAIGUA POLICE DEPARTMENT ("CPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers, sergeants, and other officials.

20.     Defendant STEPHEN HEDWORTH is the Chief of the CPD Police and is responsible for creating, supervising, administering, and/or overseeing the policies, practices, and/or customs of the CPD. He is sued in his individual and official capacities.

21.     Defendant SCOTT KADIEN (also referred to herein as "Kadien" or the "Defendant Officer") is a CPD Police Sergeant who unlawfully used excessive force in the horrific shooting and murder of Ms. Guardiola.  He is sued in his individual and official capacities as a CPD Police Sergeant.

22.     At all times relevant herein, defendants KADIEN, HEDWORTH, and the CPD Responding Officers acted under color of state law in the course and scope of their duties and/or functions as agent, employee, and/or officer of the City and/or the CPD, and incidental to the lawful pursuit of their duties as agent, employee, and/or officer of the City and/or the CPD.

23.     At all times relevant herein, defendants KADIEN, HEDWORTH, and the CPD Responding Officers violated clearly established rights and standards under the United States Constitution, of which reasonable police officers in their respective circumstances would have known.

24.     At all times relevant herein, Defendant DAWN ANDERSON (hereinafter "Chief Anderson") was the Chief of the New York State Department of Corrections and Community Supervision ("DOCCS") Parole Office in Rochester who managed and oversaw the Rochester

Office. She is sued in her individual capacity.

25.     At all times relevant herein, Defendant BETH HART-BADER (hereinafter "SPO Hart-Bader") was a Senior Parole Office employed by DOCCS in the Rochester Office who managed and oversaw Parole Officers within the Rochester Office. She is sued in her individual capacity.

26.     At all times relevant herein, Defendant THOMAS O'CONNOR (hereinafter "SPO O'Connor") was a Senior Parole Office employed by DOCCS in the Rochester Office who managed and oversaw Parole Officers within the Rochester Office. He is sued in his individual capacity.

27.     Defendant GRAND ATLAS PROPERTY MANAGEMENT, LLC ("Grand Atlas"), formerly known as Morgan Management, LLC, is a domestic Limited Liability Company based in Monroe County. GRAND ATLAS is the management company for MORGAN COMMUNITIES LLC and PINNACLE NORTH I LLC. At all times relevant to the Complaint, GRAND ATLAS owned, operated, maintained, managed, and were in control of MORGAN COMMUNITIES MANAGEMENT LLC and PINNACLE NORTH I LLC and its property located at 20 North Shore Boulevard, Canandaigua, NY 14424.

28.     In carrying out its duties, GRAND ATLAS was required to ensure that its personnel were properly trained and that the residents of its properties were safe from foreseeable harm.

29.     Defendant MORGAN COMMUNITIES MANAGEMENT LLC ("Morgan Communities") is a domestic limited liability company based in Monroe County which is professionally managed by GRAND ATLAS. At all times relevant to the Complaint, MORGAN

COMMUNITIES owned, operated, maintained, managed, and was in control of PINNACLE

NORTH I LLC and its property located at 20 North Shore Boulevard, Canandaigua, NY 14424.

30.     In carrying out its duties, MORGAN COMMUNITIES was required to ensure

that its personnel were properly trained and that the residents of its properties were safe from

foreseeable harm.

31.     Defendant PINNACLE NORTH I LLC ("Pinnacle") is a foreign Limited Liability

Company, formed in the State of Delaware and registered to operate in the State of New York.

Pinnacle is the landlord of Pinnacle North Apartments located at 20 North Shore Boulevard,

Canandaigua, NY 14424.

32.     In carrying out its duties, PINNACLE was required to ensure that its personnel

were properly trained and that its residents were safe from foreseeable harm.

33.     Defendants JOHN and JANE DOE #1 and #2 (hereinafter the "Pinnacle

Employee Defendants") were, at all relevant times, employees employed by PINNACLE and/or

MORGAN COMMUNITIES and/or GRAND ATLAS.  Each are sued individually and in their

capacity as employees of PINNACLE and/or MORGAN COMMUNITIES and/or GRAND

ATLAS.

## STATEMENT OF FACTS

### Ms. Guardiola's Background

34.     Sandy Guardiola was a 48-year-old mother of two children: Alysa and Andrew

Ocasio who were 22 and 23 respectively at the time of their mother's death.

35.     For twenty years, Sandy Guardiola worked in law enforcement.

36.     In 1991, she became a corrections officer with the New York City Department of

Corrections at Riker's Island, quickly rising up to the rank of Captain in 1995, and remaining

until 2002.  She went on to become a court officer in 2003 until approximately 2008.

37.    Ms. Guardiola was a two-time survivor of breast cancer, having first been diagnosed in April 2008. She had a double mastectomy on July 3, 2008. As of October 2017, she believed that she was cancer free.

38.    Ms. Guardiola obtained a Master's Degree in Social Work from Columbia University in 2009. She obtained a clinical social work license in 2012.

39.    From 2009 through 2015, she worked as a social worker in a number of non-profits and foster care organizations including, but not limited to, SCO Family of Services and Lutheran Social Services.

40.    In May 2015, Ms. Guardiola joined the New York State Department of Corrections and Community Supervision ("DOCCS") as a parole officer.

41.    In May 2017, Ms. Guardiola moved to Canandaigua, New York.

42.    In or about June 2017, she began working as a Parole Officer in Rochester, New York where she used her degree in social work to work specifically with parolees with serious mental health issues.

43.    Almost immediately upon arriving at the Rochester Office, she faced a number of challenges including, but not limited to, harassment and bullying from colleagues and supervisors.

44.    Because of this harassment and bullying and the hostile work environment she was subjected to in the Rochester Office, in or around July 2017, she requested a transfer to the Binghamton Office.

45.    Her transfer was approved on August 7, 2017 and she was set to begin at the new office on September 7, 2017.

46.     On all DOCCS paperwork, including her transfer paperwork, Ms. Guardiola listed her children Alysa and Andrew as her emergency contacts.

**Medical Leave**

47.     Days before she was set to start at her new position, on September 4, 2017, Ms. Guardiola was involved in a car accident.

48.     She was diagnosed with post-concussion syndrome.

49.     She was granted medical leave and remained on leave through, and including, at least October 4, 2017.

50.     In a calendar entry she made, Ms. Guardiola noted that her first day of work was scheduled as October 13, 2017.

51.     However, Ms. Guardiola was eager to get back to work.

52.     On October 3, 2017, Ms. Guardiola visited her neurologist's office in order to get necessary forms signed by her doctor which would allow her to return to work on October 4, 2017.

53.     Ms. Guardiola arrived at the doctor's office at approximately 4:30 p.m. on October 3, 2017, just as the office was closing, and asked if the doctor would see her quickly to sign the form.

54.     Her doctor signed the paperwork acknowledging that she was fit to return to work at approximately 4:30 p.m.

55.     The doctor noted that Ms. Guardiola was "smiling often," was doing well, "did not appear depressed or anxious," and showed no signs of post-concussion syndrome. She was in "good spirits" and was "excited about going back to work."

56.     However, due to the lateness of her medical appointment on October 3, 2015, Ms.

Guardiola was unable to submit the paperwork to her employer at Binghamton because the office had already closed for the day.

## Officer Kadien's Unreasonable Entry and Use of Excessive and Deadly Force on October 4, 2017

57.    On October 3, 2017, Ms. Guardiola went to bed at approximately 7:30 p.m. believing that she needed to be at work early the next morning for work.

58.    Upon information and belief, in order to make the approximately 3-hour drive to Binghamton, Ms. Guardiola woke up at approximately 4:00 a.m. on October 4, 2017.

59.    Upon information and belief, on the morning of October 4, 2017, Ms. Guardiola communicated with the Binghamton Office.

60.    On October 4, 2015, she did not communicate with her prior office in Rochester because she was no longer employed there.

61.    After communicating with the Binghamton Office, Ms. Guardiola apparently remained home and went back to sleep.

62.    Ms. Guardiola was in the habit of sleeping with earplugs in her ears. She was also prescribed medicine to help her sleep.

63.    At approximately 4:30 p.m., Defendant Thomas O'Connor, a Senior Parole Officer from the Rochester Office of DOCCS, not the Binghamton Office where Ms. Guardiola had been transferred, called 911 requesting a welfare check, claiming that Ms. Guardiola had been missing from work for three weeks.

64.    The circumstances surrounding why Defendant O'Connor would have called in this welfare check are not fully known at this time.  However, Ms. Guardiola was being harassed and bullied by employees in the Rochester office, which led her to request a transfer, and this call, upon information and belief, was part of this pattern of harassment.

10

65.     Defendant Senior Parole Officer O'Connor did not attempt to contact Alysa or Andrew Ocasio, Ms. Guardiola's listed emergency contacts, before calling 911.

66.     The Canandaigua Police Department ("CPD"), the Canandaigua Fire Department ("CFD"), and the Canandaigua Emergency Squad ("CES") all responded to a call sent through the emergency dispatch center.

67.     At 4:32 p.m. ambulances from CFD and CES were en route to a location near Ms. Guardiola's home where they were to stand by while a law enforcement official handled the welfare check.

68.     Responders from CES and CFD stationed themselves in a parking lot across the street from Ms. Guardiola's apartment complex.

69.     Simultaneously, CPD Sergeant Kadien responded to the call.

70.     Kadien arrived at 20 North Shore Drive and, upon information and belief, requested that the Pinnacle Employee Defendants escort him to Ms. Guardiola's apartment.

71.     Kadien did not conduct an independent investigation as to whether there were, in fact, exigent circumstances that would warrant an unlawful and warrantless entry into Ms. Guardiola's apartment, nor was he aware of any.

72.     He did not have a warrant to enter Ms. Guardiola's apartment.

73.     He did not attempt to confirm whether Ms. Guardiola had, in fact, gone into work at her new office in Binghamton on October 4, 2017.

74.     He did not attempt to verify whether Ms. Guardiola was in her apartment.

75.     He did not attempt to contact Ms. Guardiola's emergency contacts.

76.     Kadien relied solely on the account from the emergency dispatch called in by Defendant O'Connor, an employee of the Rochester Office of Parole, that, upon information and

belief, Ms. Guardiola had not appeared for work at the Rochester office where she no longer worked.

77.     Upon information and belief, Kadien knew that Ms. Guardiola was a Parole Officer who was licensed to carry a handgun.

78.     Without requesting further information or proof of exigent circumstances to warrant such an intrusion, and without any legal authorization to do so, the Pinnacle Employee Defendants escorted Kadien to Ms. Guardiola's apartment and then permitted Kadien to unlawfully enter.

79.     Without a warrant to do so and without any basis to believe that Guardiola was even in her apartment, Kadien opened the door to Ms. Guardiola's apartment.

80.     Kadien walked into Ms. Guardiola's apartment at approximately 4:30 p.m., passing a closet and the kitchen to his left and the bathroom and a closet to his right.

81.     He eventually made his way to Ms. Guardiola's bedroom.

82.     Ms. Guardiola, who was sleeping in her bed, was positioned near a north-facing window perpendicular from the doorway. As she lay sleeping in her bed, the window, which overlooked her balcony, was on Ms. Guardiola's right (if she was face-up) and the bedroom doorway was to Ms. Guardiola's left.

83.     Ms. Guardiola, who was a parole officer for individuals with serious mental health issues some of whom had violent tendencies and, upon information and belief, had threatened her, slept with her service revolver near her bed or under her pillow for protection.

84.     She was awakened by the sight of someone she did not know opening the door to her bedroom and walking into her bedroom.

85.     Seeing her bedroom door opening, and presumably in fear for her life, and

consistent with the autopsy identifying the entry and exit points of her wounds, Ms. Guardiola used her right arm to reach for her New York State Parole-issued service revolver.

86.     Upon information and belief, and based on the autopsy records examined to date, Ms. Guardiola, while on her stomach, reached using her right arm to get her service revolver from underneath a pillow.   Seeing this, and upon information and belief, Kadien shot Ms. Guardiola in the back of her right arm. Kadien's bullet exited the front of Ms. Guardiola's arm and then entered, upon information and belief, her right ear and head.

87.     Upon information and belief, as a result of the shot to her right arm, Ms. Guardiola's reflexes caused her service weapon to discharge in the opposite direction of Kadien, hitting the wall to the right of her bed and exiting onto her balcony.

88.     Following his first shot, Kadien then shot Ms. Guardiola two more times, once more in the head and once in the abdomen.

89.      Only a matter of seconds had passed between Kadien unlawfully entering the apartment, opening her closed bedroom door, and then shooting Ms. Guardiola.

90.     It is clear from the path of the bullet from Ms. Guardiola's gun that she never shot or pointed a gun in Kadien's direction.  At no time was Kadien in any reasonable fear of being shot by Guardiola.

91.     Rather than summon the emergency medical providers who were across the street, Kadien first called for law enforcement backup.

92.     Law enforcement officials immediately responded including, but not limited to, the Canandaigua Police Department officers, Ontario County Sheriff's Office officials, and New York Police Department officers.

93.     Law enforcement officials were called prior to the CES and CFD emergency

responders who had been waiting across the street.

94.    In fact, upon information and belief, Defendant Chief Hedworth arrived prior to the arrival of the emergency responders.

95.    At approximately 4:38 p.m., CFD received an emergency dispatch call requesting that they respond to 20 North Shore Boulevard immediately. They arrived at 4:39 p.m.

96.    The CFD emergency responders arrived prior to CES.

97.    While in the elevator, at approximately 4:40 p.m., law enforcement officials informed the CFD emergency responders that they were responding to a patient who was shot by law enforcement. This was the first time that CFD officials were informed that shots had been fired.

98.    The CFD emergency responders were also told by law enforcement officials that the "female patient had been down for approximately 10 minutes."

99.    At approximately 4:41 p.m., the CES emergency responders, who had been stationed across the street, received a call that shots had been fired.

100.    When the CFD emergency responders arrived at Ms. Guardiola's apartment at approximately 4:45 p.m., the apartment was already filled with law enforcement officers including, but not limited to, the Canandaigua Police Department officers, Ontario County Sheriff's Office officials, and New York Police Department officers.

101.    The emergency responders found Ms. Guardiola lying "supine" on her bed with "copious amounts of blood."

102.    The scene was not properly cleared for the emergency responders who were there to treat Ms. Guardiola, who, when they arrived, was still alive and breathing.

103.    The emergency responders noted that Ms. Guardiola had already been

handcuffed.

104.    CES and CFD transported Ms. Guardiola to the ambulance while continuing to conduct CPR.

105.    At 5:08 p.m., Ms. Guardiola arrived at F.F. Thompson Hospital. After approximately 20 minutes of attempted resuscitation, doctors declared Ms. Guardiola deceased at 5:30 p.m.

## CPD's Unlawful Practice regarding Wellness Checks

106.    By its own admission, the CPD conducts approximately 20 to 30 wellness checks a month.

107.    On April 2, 2018, Ontario County District Attorney James B. Ritts, who was tasked with the criminal investigation into Defendant Kadien's actions, stated, "in the month of March, . . . there were five days as of the 29th where there was not a check-the-welfare call that came in."

108.    He added "it's not uncommon for check-the-welfare to be after a day when somebody doesn't show up and is not responsive." He added that, with respect to Kadien's unlawful entry into Ms. Guardiola's apartment and then into her bedroom, "there's nothing that was odd about him going in."

109.    At the same press conference on April 2, 2018, Defendant Chief Hedworth stated that Kadien did not violate the policies and procedures of the Department.

110.    In fact, Chief Hedworth stated that Defendant Kadien "was within the policies and procedures of our Department."

111.    These policies and/or practices and/or procedures were the proximate cause of Ms. Guardiola's death.

112.    The City of Canandaigua failed to adequately screen, train, supervise, or discipline police officers regarding the appropriate implementation of wellness or welfare checks on civilians.  This policy, which is evidence of the City of Canandaigua's deliberate indifference to constitutional rights, included, but is not limited to, the following: failing to investigate the claim of exigency or concern to ensure that there is a basis for the unlawful entry; failing to engage in a proper investigation into the call for a wellness check to make an independent determination that the check is appropriate; the lack of any procedural safeguards to ensure that the constitutional rights of those subject to welfare checks are not violated; and failing to employ less lethal or invasive procedures in the conduct of welfare checks.

113.    The policy implemented by Defendant Chief Hedworth sanctioned the unlawful entrance into the homes of residents without probable cause, a warrant, or exigent circumstances and without receiving proper training in how to conduct such welfare checks, and constituted deliberate indifference to constitutional rights.

114.    Defendant Chief Hedworth's comment, at the April 2, 2018 press conference, that Kadien's actions "were within the policies and procedures of our department" also constitutes ratification of the Defendant City's unconstitutional policy.

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

115.    Plaintiffs served a Notice of Claim upon the City of Canandaigua on November 20, 2017, within ninety days of the events giving rise to their claims.

116.    On March 30, 2018, Plaintiff Jahaira Holder, as Administratrix of the Estate of Sandy Guardiola, appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

117.    More than thirty days have elapsed since Plaintiffs served their Notice of Claim and the City has not offered adjustment or payment thereof.

### FIRST CAUSE OF ACTION
**42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights**
**(against Defendants KADIEN, ANDERSON, O'CONNOR, and HART-BADER)**

118.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

119.    In committing the acts and omissions complained of herein, Defendants Kadien, Anderson, O'Connor, and Hart-Bader acted under color of law to deprive Ms. Guardiola and the Plaintiffs of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

a.    the right to privacy;

b.    the right to be free from unreasonable search and seizure;

c.    the right to be free from excessive force;

d.    the right to be free from deprivation of life and liberty without due process of law; and

e.    the right to freely associate with one's family and loved ones.

120.    Defendants Kadien, Anderson, O'Connor, and Hart-Bader personally violated these constitutional rights, or failed to intervene to prevent the violations of these rights, even though they had the ability and opportunity to do so.

121.    As a direct and proximate result of being deprived of these constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

122.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Conspiracy to Violate the Fourth and Fourteenth Amendments
### (against KADIEN, ANDERSON, O'CONNOR, and HART-BADER)

123.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

124.     Defendants Anderson, O'Connor, and Hart-Bader conspired individually to punish Ms. Guardiola for filing a complaint against them and for requesting a transfer to a different office. This conspiracy by these Defendants was the direct cause of the welfare check called in by O'Connor.

125.     Defendants Anderson, O'Connor, and Hart-Bader knew or should have known that there was no basis to call in a welfare check on Ms. Guardiola. In fact, as of the day of her death, Ms. Guardiola no longer worked in the Rochester Office of Parole, having requested a transfer because these Defendants had subjected her, *inter alia*, to a hostile work environment.

126.     The acts of the Defendants, including Kadien, Anderson, O'Connor, and Hart-Bader deprived Ms. Guardiola of rights, privileges, and immunities secured by the Constitution and laws of the United States.

127.     As a direct and proximate result of the conduct alleged herein, the Defendants conspired to and, thereafter, deprived Ms. Guardiola of the following clearly established rights under the Fourth and Fourteenth Amendments of the United States Constitution, more specifically:

        a.   the right to privacy;

        b.   the right to be secure in one's home;

        c.   the right to be free from unreasonable search and seizure;

        d.   the right to be free from excessive force; and

e.  the right to be free from deprivation of life and liberty without due process of law.

128.    In committing the acts and omissions complained of herein, the Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens, Ms. Guardiola in this case, from infringement by other law enforcement officers in their presence.

129.    In furtherance of this conspiracy, Defendants engaged in, *inter alia*, the following overt acts:

a.    Calling for a law enforcement wellness check when they knew that Ms. Guardiola was no longer employed at the Rochester Office of Parole and without any justification for doing so;

b.    Unlawfully entering Ms. Guardiola's apartment;

c.    Failing to contact Ms. Guardiola's emergency contacts;

d.    Unlawfully opening Ms. Guardiola's closed bedroom door; and

e.    Jointly devising a false, exculpatory version of the events of October 4, 2017, which would be told to investigating authorities;

f.    Submitting false reports, statements, and testimony to support and corroborate the fabricated allegations that Ms. Guardiola had not shown up for work, pointed a weapon at Kadien, or threatened Kadien in any way.

130.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifferent to the clear risk of death or serious injury to Ms. Guardiola that shocks the conscience. They are therefore also liable for punitive damages.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 and Article 1, § 12 of the New York State Constitution**
**(against the CITY OF CANANDAIGUA)**

131.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.    The unconstitutional conduct of Defendant Kadien was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City.

133.    Defendant City of Canandaigua developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of Sandy Guardiola's rights.

134.    It is a custom, policy, and/or practice of the City to improperly and unconstitutionally gain access to an individual's home under the guise of a welfare check without obtaining a warrant.

135.    The City of Canandaigua has developed and maintained a culture of indifference with respect to unlawful entries into premises and residences.

136.    It is also a custom, policy, and/or practice of the City of Canandaigua to conduct inadequate screening in the hiring of police officers for their propensity for violence.

137.    The City of Canandaigua developed and maintained a culture of indifference with respect to wellness checks and the constitutional rights of its residents.

138.    As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies and the City's deliberate indifference, Sandy Guardiola's constitutional rights were violated, because of which she suffered substantial damages at an amount to be determined at trial.

139.    By reason of the foregoing, Plaintiffs Alysa Ocasio and Andrew Ocasio, as the children of Ms. Guardiola, therefore the statutory distributees of Ms. Guardiola's estate, sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Ms. Guardiola. Defendants are liable for the wrongful death of Ms. Guardiola.

140.    As a result of the foregoing, Plaintiffs suffered the injuries and damages alleged herein.

### FOURTH CAUSE OF ACTION
**42 U.S.C. § 1983 --- Violation of Plaintiff's Fourteenth Amendment Rights to be Free from Wrongful Government Interference with Familial Relationships)**
**(against the Individual Defendants and the CITY OF CANANDAIGUA)**

141.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

142.    By the actions and omissions described above, the Defendants violated 42 U.S.C. § 1983, by depriving Plaintiffs and decedent of the right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support, as secured by the Fourteenth Amendment.

143.    In committing the acts and omissions complained of herein, Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

144.    These Defendants, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to a pattern, policy, or practice that interfered with Plaintiff's Fourteenth Amendment right to be free from wrongful government interference with familial relationships.

145.    By reason of the foregoing, Defendants physically and intentionally interfered with rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendments of the United States Constitution.

146.    As a result of the foregoing, Plaintiffs Alysa Ocasio and Andrew Ocasio suffered injury, loss of support, society, guidance and assistance, and economic loss.

147.    As a direct and proximate result of Defendants' deprivation of Plaintiffs' constitutional rights, she suffered the injuries and damages set forth above.

148.    These Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of physically interfering with Plaintiffs' right to familial association with their mother that shocks the conscience. They are therefore also liable for punitive damages.

<strong>FIFTH CAUSE OF ACTION</strong><br><strong>Violations of New York State Constitution</strong><br><strong>(against KADIEN, ANDERSON, O'CONNOR, and HART-BADER)</strong>

149.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

150.    Kadien, Anderson, O'Connor, and Hart-Bader, jointly and severally, subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving the Plaintiffs of rights, privileges, and immunities guaranteed by Article 1, § 6 and 12 of the New York State Constitution, including, without limitation, the right to due process and the right to be free from unreasonable searches and seizures.

151.    At all relevant times, Defendant Kadien was an employee of the City and was acting within the scope of his employment.

22

152.    The City of Canandaigua is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendant Kadien set forth herein.

153.    As a direct and proximate result of Defendants' deprivations of Ms. Guardiola's and Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Ms. Guardiola and Plaintiffs suffered the injuries and damages set forth above.

## SIXTH CAUSE OF ACTION
### Assault and Battery
### (against Defendant KADIEN)

154.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

155.    Defendant Kadien, without just cause, wilfully and maliciously used physical force against Ms. Guardiola, causing her death.

156.    At all relevant times, Defendant Kadien was an employee of the City and was acting within the scope of their employment.

157.    The City of Canandaigua is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendant Kadien set forth herein.

158.    Defendant KADIEN committed the foregoing acts intentionally, wilfully, and with malicious disregard for Ms. Guardiola's rights, and is therefore liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### Negligence/ Premises Liability
### (against PINNACLE, GRAND ATLAS, MORGAN COMMUNITIES, PINNACLE EMPLOYEE DEFENDANTS)

159.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

160.    Defendants Pinnacle and/or Morgan Communities and/or Grand Atlas maintained control over the egress and ingress into the building.

161.    As a result, Defendants Pinnacle and/or Morgan Communities and/or Grand Atlas, either individually or by and through its agents, servants, and/or employees acted with less than reasonable care and is therefore liable for the negligent, careless acts and/or omissions, including:

    a.  Providing Defendant Kadien, an armed law enforcement official, the key or permission to enter Ms. Guardiola's apartment without her consent;

    b.  Improperly operating, managing, and maintaining its premises at 20 North Shore Boulevard, Canandaigua, New York 14424;

    c.  Improperly or negligent training its employees with respect to securing the facility;

    d.  Improperly training its employees on proper policy or procedure for entry of unknown persons, including law enforcement agents; and

    e.  Failing to otherwise exercise due care with respect to the matters alleged herein.

162.    The Pinnacle Employee Defendants, through the foregoing acts, negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful person would have used under similar circumstances.

163.    At all relevant times, the Pinnacle Employee Defendants were employed by the Pinnacle and/or Morgan Communities and/or Grand Atlas and were acting within the scope of their employment.

164.    Pinnacle and/or Morgan Communities and/or Grand Atlas are therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Pinnacle Employee Defendants.

165.    All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of injuries to Plaintiffs.

166.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

**EIGHTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**
**(against PINNACLE, MORGAN COMMUNITIES, GRAND ATLAS,**
**and PINNACLE EMPLOYEE DEFENDANTS)**

167.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

168.    Defendants John and Jane Doe #1 and #2, as employees of Pinnacle and/or Morgan Communities and/or Grand Atlas, are tasked with protecting residents of Pinnacle, and owed Plaintiffs a duty of care.

169.    By reason of the foregoing, Defendants are liable to Plaintiff Alysa Ocasio and Plaintiff Andrew Ocasio, in their individual capacities, for the negligent infliction of emotional distress.

170.    As a result, Plaintiffs suffered emotional distress.

171.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

**NINTH CAUSE OF ACTION**
**Negligent Hiring, Training, and Discipline**
**(against PINNACLE, MORGAN COMMUNITIES, and GRAND ATLAS)**

172.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

173.    Defendants Pinnacle and/or Morgan Communities and/or Grand Atlas owed a duty of care to Sandy Guardiola to prevent the conduct alleged, because under the same or similar circumstances, a reasonable prudent, and careful person should have anticipated that injury to Ms. Guardiola or to those in a like situation would likely result from the foregoing

25

conduct; namely, authorizing an armed officer into a resident's apartment.

174.    Defendants Pinnacle and/or Morgan Communities and/or Grand Atlas, failing to adequately train its employees or employ enough staff to secure the entrance, negligently failed to use due care in the performance of its duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful landlord and/or property management companies would have used under similar circumstances.

175.    Pinnacle and/or Morgan Communities and/or Grand Atlas knew or should have known through the exercise of reasonable diligence that the individuals it employed needed to be adequately trained when securing a residence. Pinnacle and/or Morgan Communities and/or Grand Atlas's negligence in screening, hiring, training, disciplining, and retaining its employees, including the Pinnacle Employee Defendants, proximately caused Plaintiffs' injuries.

176.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

**TENTH CAUSE OF ACTION**
**Wrongful Death**
**(against the Individual Defendants, the CITY OF CANANDAIGUA, O'CONNOR, PINNACLE, MORGAN COMMUNITIES, and GRAND ATLAS)**

177.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

178.    The acts of the Defendants, alleged herein, individually and collectively wrongfully caused the death of Sandy Guardiola.

179.    By reason of the foregoing, Plaintiffs Alysa Ocasio and Andrew Ocasio, as the children of Ms. Guardiola, therefore the statutory distributees of Ms. Guardiola's estate, sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Ms. Guardiola. Defendants are liable for the wrongful death of

Ms. Guardiola.

180.    At all relevant times, Defendant Kadien was an employee of the City and was acting within the scope of their employment.

181.    The City of Canandaigua is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendant Kadien set forth herein.

182.    At all relevant times, the Pinnacle Employee Defendants were employed by the Pinnacle and/or Morgan Communities and/or Grand Atlas and were acting within the scope of their employment.

183.    Pinnacle and/or Morgan Communities and/or Grand Atlas are therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendants John and Jane Doe #1 and #2.

184.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

185.    As a consequence, Plaintiffs have suffered damages in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
**Pain and Suffering**
**(against the Individual Defendants and the CITY OF CANANDAIGUA)**

186.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

187.    The acts of the Defendants, alleged herein, wrongfully caused Ms. Guardiola to suffer severe physical injuries, excruciating pain, mental anguish and awareness of impending death.

188.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs

have suffered damages in an amount to be determined at trial.

## **DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants, jointly and severally:

(a)     compensatory damages of at least $50,000,000.00, or in an amount just and reasonable and in conformity with the evidence at trial

(b)     punitive damages against the individual defendants;

(c)     attorneys fees;

(d)     the costs and disbursements of this action;

(e)     interest; and

(f)     such other and further relief as this Court deems just and proper.

Dated: October 4, 2018
         New York, New York

                                    BELDOCK LEVINE & HOFFMAN LLP

                                    By: _____
                                         Jonathan C. Moore, Esq.
                                         Luna Droubi, Esq.
                                    99 Park Avenue, PH/26th Floor
                                    New York, New York 10016
                                    t: (212) 490-0400
                                    e:     jmoore@blhny.com
                                           ldroubi@blhny.com

                                    *Attorneys for Plaintiffs*