UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALYSA OCASIO, ANDREW OCASIO and
JAHAIRA HOLDER, as Administratrix of the Estate
of Sandy Guardiola,

                                    Plaintiffs,

                  v.

CITY OF CANANDAIGUA, a municipal entity;
Canandaigua Police Chief STEPHEN HEDWORTH,
in his individual and official capacities; Canandaigua
Police Sergeant SCOTT KADIEN, in his individual
capacity; DOCCS Parole Chief DAWN ANDERSON,
in her individual capacity; DOCCS Senior Parole Officer
THOMAS O'CONNOR, in his individual capacity;
GRAND ATLAS PROPERTY MANAGEMENT, LLC,
formerly known as MORGAN MANAGEMENT, LLC,
a domestic Limited Liability Company; MORGAN
COMMUNITIES MANAGEMENT, LLC ("Morgan
Communities"), a domestic Limited Liability Company;
PINNACLE NORTH I LLC ("Pinnacle"), a foreign
Limited Liability Company; and JOHN and JANE DOE
#1 and #2, employees of GRAND ATLAS, MORGAN
COMMUNITIES, and/or PINNACLE,

                                    Defendants.

_____

DECISION AND ORDER

18-CV-6712L

On October 4, 2017, Sandy Guardiola ("Guardiola") was shot three times as she slept in her bed in Canandaigua, New York, by Canandaigua Police Sergeant Scott Kadien ("Kadien"). Guardiola, a long-time parole officer with the New York State Department of Corrections ("DOCCS"), was at home on medical leave, recovering from a motor vehicle accident that had occurred a month previously. Guardiola did not survive the shooting; she died shortly after arriving at the hospital. Kadien had entered Guardiola's home in response to a 9-1-1 call requesting a

"welfare check" because Guardiola had been absent from work. Kadien, who apparently knew that Guardiola was a law enforcement officer, gained entry to the home, entered Guardiola's bedroom and within seconds fired the three fatal shots. Plaintiffs are the heirs and administratrix of Guardiola. They have commenced this action in Federal Court against several defendants, including Sergeant Kadien, the City of Canandaigua, its police chief, employees of DOCCS, as well as the owner and property manager of the apartment complex where Guardiola resided, Grand Atlas Property Management ("Grand Atlas").

Now pending before the Court are motions to dismiss, pursuant to Fed. R. Civ. P. 12(c) by Sergeant Kadien (Dkt. #44), as well as a similar motion by defendant City of Canandaigua and its police chief (Dkt. #45).[1] For the reasons that follow, the motions by Kadien and the City defendants are granted in part and denied in part.

## FACTUAL BACKGROUND

According to the complaint (Dkt. #1), Guardiola was a parole officer employed by DOCCS. She had been assigned to the Rochester Office. She was on medical leave from September 4, 2017 through October 3, 2017 following a motor vehicle accident, during which time she was granted a voluntary transfer to the Binghamton DOCCS office.

On the morning of October 4, 2017, Guardiola called the Binghamton DOCCS office to see if she was expected to report for work that day. Having determined that she was not expected at work, she went to bed. The complaint notes that Guardiola habitually wore earplugs when she slept, and had been prescribed medication to help her sleep.

---

[1] DOCCS defendants have not made a dispositive motion.  The property owners and management company, Grand Atlas, had also moved to dismiss but, after mediation, all those property-related defendants have settled the action (Dkt. #71) and, therefore, their motion to dismiss is moot and is denied as such.

For reasons unknown,[2] around 4:30pm, Thomas O'Connor, a Senior Parole Officer in the Rochester DOCCS office from which Guardiola had been transferred, called 9-1-1 and requested a welfare check on Guardiola, allegedly on the basis that she had been "missing" from work for three weeks.

Sergeant Kadien was dispatched to Guardiola's apartment along with emergency services, including an ambulance which positioned itself across the street. At Kadien's request, building management staff escorted him to Guardiola's apartment and used their keys to unlock it. Kadien walked through the apartment past the kitchen and bathroom, and opened the closed door to Guardiola's bedroom, where she was sleeping. The complaint avers that as Kadien entered Guardiola's bedroom, Guardiola, who was lying on her stomach, awoke and reached in the direction of a pillow where she kept her service revolver which she typically kept there for protection, after receiving threats from parolees with serious mental issues.

The complaint contends that Kadien did not attempt to retreat or to announce that he was a police officer, but instead, shot Guardiola in the right arm, with the bullet passing through her arm and into her right ear and head. Guardiola's firearm then discharged in the opposite direction from Kadien and into a wall, whereupon Kadien shot Guardiola twice more, in the head and abdomen. The time that elapsed between Kadien's entry into the apartment and his fatal shooting of Guardiola is alleged to have been mere seconds.

When emergency responders arrived approximately ten minutes after the shooting, Guardiola was lying supine on her bed, handcuffed and bleeding profusely, but still breathing. She

---

[2]  The complaint alleges that plaintiff had requested the transfer to the Binghamton office because she was experiencing harassment and bullying in the Rochester office. The complaint indicates that O'Connor, who presumably knew or should have known that Guardiola had been out on medical leave and was no longer employed by the Rochester office, and who allegedly made no attempt to contact any of Guardiola's emergency contacts before calling 9-1-1, may have requested the welfare check simply to harass her.

was transported to the hospital, where she was pronounced dead at 5:30pm after resuscitation attempts proved futile.

This action followed. The complaint asserts several causes of action including unlawful search and seizure, excessive force, conspiracy to violate constitutional rights, interference with family relationships, assault and battery, premises liability, negligent infliction of emotional distress, negligent hiring, training and discipline, conscious pain and suffering, and wrongful death. (Dkt. #1).

## DISCUSSION

### I.    Relevant Standard

On a motion to dismiss under Rule 12 (c), courts "employ the same standard applicable to Rule 12(b)(6) motions to dismiss." *Montgomery v. NBC TV*, 2020 U.S. App. LEXIS 35731 at *2 (2d Cir. 2020)(unpublished opinion)(quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015)(internal quotation marks and alterations omitted)).

The Court's task is thus to determine whether, "accept[ing] the allegations contained in the complaint as true, and draw[ing] all reasonable inferences in favor of the non-movant," plaintiffs have stated a facially valid claim. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). In order to be found sufficient, a pleading must set forth sufficient facts to suggest that a cause of action is legally plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Ultimately, where a plaintiff has not "nudged their claim[] across the line from conceivable to plausible, their complaint must be dismissed." *Id*.

II.     **First Cause of Action: Violation of the Fourth and Fourteenth Amendments against Kadien and the DOCCS Defendants (42 U.S.C. §1983)**

      A.     **Unlawful Entry**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). It is thus a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 749.

In order to overcome this presumption, the warrantless entry of a home must fall under a relevant exception, such as the "exigent circumstances" or "emergency aid" doctrine, which excuses a warrantless entry "if law enforcement has probable cause to believe that a person is 'seriously injured or threatened with such injury.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020)(quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Police seeking to apply the doctrine bear a heavy burden to demonstrate that "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *Chamberlain*, 960 F.3d 100 at 106 (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)). The touchstone is urgency.

Kadien argues that any reasonable, experienced officer who received a similar welfare check request (that is, a request based on a 9-1-1 call from an individual's employer, stating that they had been absent from work for three weeks), would have probable cause to believe that there was an urgent need to render aid or take action. Therefore, he argues, the exigent circumstances exception so clearly applies that the Court may decide it as a matter of law on the instant motion to dismiss.

The Court disagrees. First, it is well-settled that a 9-1-1 call or a welfare check request does not, by itself, establish exigent circumstances: entitlement to the exception requires convincing "indicia of distress." *Pennington v. City of Rochester*, 2018 U.S. Dist. LEXIS 101499 at \*10 (W.D.N.Y. 2018). Such indicia may include, for example, a witness's or victim's report of a serious injury or medical emergency, or an inability to locate a missing and vulnerable individual to confirm their well-being despite a reasonable investigation and other attempts to reach them.

Courts have found the exception applicable in matters where, for example, a weak-sounding person called 9-1-1 and reported having just been shot, or where a missing elderly couple did not respond after officers knocked on their front and back doors for 20 minutes, and searched in vain for them around their neighborhood and at the community center they frequented. *See Warren v. Ewanciw*, 2019 U.S. Dist. LEXIS 23841 (S.D.N.Y. 2019); *Soller v. Boudreaux*, 2015 U.S. Dist. LEXIS 14084 (E.D.N.Y. 2015).

Resort to the exigent circumstances exception has been denied, however, where a 9-1-1 call or a welfare request check was unaccompanied by indications that help was *urgently* needed, such as when an officer conducting a welfare check made a warrantless entry into a private residence after briefly knocking on a door and window, without any knowledge of why the welfare check had been requested or any factual basis to believe that the subject was in danger. *See Pennington*, 2018 U.S. Dist. LEXIS 101499. *Accord DeSantis v. Town of Cheektowaga*, 2020 U.S. Dist. LEXIS 56086 at \*18-\*19 (W.D.N.Y. 2020)(declining to find defendant officer is entitled to summary judgment with respect to the exigent circumstances exception, where a jury could conclude that the officer's knowledge about a resident – that he had a "history" of drinking and was not responding to attempts by someone else to contact him – did not furnish a reasonable basis to believe that the resident required any immediate assistance).

Here, the information alleged to have been known by Kadien at the time he entered Guardiola's residence is insufficient at this stage, on a motion to dismiss, to find as a matter of law that Kadien's actions were objectively reasonable. Construing the facts in plaintiffs' favor, as the Court must on a motion to dismiss, neither the nature of the underlying 9-1-1 call (coming from an alleged employer, rather than a neighbor or family member with personal knowledge of Guardiola's habits and schedule), nor the three-week period Guardiola was alleged to have been absent from work,[3] would have persuaded a reasonable officer that Guardiola was in such urgent danger that an immediate entry into her apartment – without obtaining a warrant, conducting any inquiries of neighbors or family members, or attempting to reach Guardiola in a less intrusive manner (e.g., knocking on doors and windows) – was necessary.

Accordingly, the Court declines to dismiss plaintiffs' Fourth Amendment claims related to the warrantless entry of Guardiola's apartment.

### B.     Excessive Force

The standard for assessing a claim of excessive force under the Fourth Amendment is one of "objective reasonableness," which "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Three primary considerations guide the Court's consideration: (1) the nature and severity of the action that precipitated the use of force (e.g., in circumstances involving an arrest, this generally refers to the nature and severity of the crime precipitating the arrest); (2) whether the individual against whom force was used posed an immediate threat to the safety of the officer or

---

[3] Kadien was told that Guardiola had been absent from work for three weeks, and he was allegedly aware that Guardiola was a parole officer. Even assuming *arguendo* that a reasonable officer might conclude that a parole officer's absence from work was a concern, common-sense would dictate that a three-week absence did not suggest an immediate, dire emergency situation.

others; and (3) whether the individual was actively resisting arrest or attempting to flee. *See Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015). As to the third factor, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit. The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000).

Here, the complaint alleges that Kadien entered a sleeping woman's locked apartment, made his way to her bedroom, opened the bedroom door, walked into the room unannounced, and shot her three times in her own bed as she reached toward a place she kept a gun to defend herself. Whether that use of force was justified under the circumstances – for example, whether and to what extent Guardiola ever posed a threat to Kadien's safety, and whether Kadien's response was proportionate to that threat – requires a detailed and fact-specific inquiry, and would be inappropriate for this Court to decide at the motion to dismiss stage. *See Oakley v. Dolan*, 2020 U.S. App. LEXIS 35957 at *11 (2d Cir. 2020)("[b]ecause of its intensely factual nature, the question of whether the use of force was justified under the circumstances is generally best left for a jury to decide . . . *[t]hese principles apply with even greater force at the motion to dismiss stage, where a court must assume the truth of the plaintiff's allegations and avoid resolving factual disputes*")(emphasis added)(internal quotations and citation omitted). *See also Oliphant v. Villano*, 2012 U.S. Dist. LEXIS 115612 at *25 (D.Conn.2012) (reasonableness of a police officer's actions is a question of fact for the jury to resolve).

Kadien's motion to dismiss plaintiffs' excessive force claims is accordingly denied.

C.     **Fourteenth Amendment Excessive Force**

Considering plaintiffs' excessive force claims as alternatively pled under the Fourteenth Amendment, "the substantive due process guarantee of the Fourteenth Amendment protects individuals from 'conscience-shocking' exercises of power by government actors," such as "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001).

In *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018), the Second Circuit specified that the "objectively unreasonable degree of force" analysis outlined by the Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), is applicable to all Fourteenth Amendment excessive force claims because "purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force is conscience shocking." *Edrei*, 892 F.3d 525 at 536 (emphasis in original). Relevant factors include whether force was necessary in light of the threat reasonably perceived by the officer, whether the person against whom force was used was actively resisting, the relationship between the need and the degree of force used, the extent of the resulting injuries, and the officer's efforts to temper or limit the force used. *See Kinglsey*, 135 S.Ct. 2466 at 2473; *Edrei*, 892 F.3d 525 at 536.

Again, plaintiffs have alleged that Kadien made a warrantless entry into a law enforcement officer's apartment in the middle of the afternoon, fatally shot her in her own bed when she attempted to defend herself without making any effort to deescalate the situation, and then callously failed to immediately summon or render medical aid as she lay dying. Indeed, the complaint alleges that rather than call the ambulance that was waiting across the street to assist the wounded Guardiola, Kadien first called for law enforcement backup to respond and protect *him*,

despite the fact that Guardiola had been incapacitated by her injuries and was observed to be lying on her bed, bleeding profusely and handcuffed at the time medical help was finally called to the scene at least 10 minutes later. (Dkt. #1 at ¶¶91-103).

For purposes of the instant motion, these allegations, construed in plaintiffs' favor as they must be on a motion to dismiss, describe a use of force that is sufficiently unreasonable and conscience-shocking to state a Fourteenth Amendment excessive force claim. *See e.g.*, *Abujayyab v. City of New York*, 2018 U.S. Dist. LEXIS 140914 at *14 (S.D.N.Y. 2018)(plaintiff stated a claim for excessive force under the Fourteenth Amendment, where he alleged that the defendant officer punched plaintiff in the face while plaintiff's arms were pinned behind his back during a peaceful protest). Kadien's motion to dismiss this claim is denied.

### D.      Qualified Immunity

Kadien also requests that even if the Court finds that plaintiffs have sufficiently stated their Constitutional claims, he is entitled to qualified immunity for his conduct.

For the reasons discussed above, the Court cannot conclude at this juncture that Kadien is entitled to qualified immunity. In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *See Weyant v. Okst*, 101 F.3d 845, 857-858 (2d Cir. 1996). The availability of the defense depends on whether "a reasonable officer could have believed" his or her actions to be lawful, in light of clearly established law and the information he or she possessed. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

As the Second Circuit recently observed, "[t]o be sure, qualified immunity should be resolved 'at the earliest possible stage in litigation.'" *Chamberlain*, 960 F.3d 100 at 110 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)(internal quotation marks omitted)). "But there is

an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be resolved before the 'earliest possible stage,' . . . i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised. And since qualified immunity is an affirmative defense that is typically asserted in an answer, as a general rule, the defense of qualified immunity cannot support the grant of a . . . motion [to dismiss on the pleadings]." *Chamberlain*, 960 F.3d 100 at 110 (internal citations and quotation marks omitted)(quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)).  This "general rule" certainly applies here.

Thus, where introduced as part of a motion to dismiss on the pleadings, a qualified immunity defense "faces a formidable hurdle . . . and is usually not successful." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006)(internal quotation marks omitted). Here, the facts alleged do not establish that a reasonable officer would have believed that Kadien's actions, in light of what he knew at the time, were in conformity with clearly established laws. Kadien's motion seeking dismissal of plaintiffs' claims on grounds of qualified immunity is accordingly denied.

**III.   Second Cause of Action: Conspiracy to Violate the Fourth and Fourteenth Amendments against Kadien and the DOCCS Defendants**

In order to state a claim for conspiracy under Section 1983, a plaintiff must allege: (1) an agreement between two or more actors (at least one a state actor); (2) to act in concert to cause an unconstitutional injury; and (3) an overt act done in furtherance of that agreement, causing damages. *Ciambriello v. County of Nassau*; 292 F.3d 307, 324-25 (2d Cir. 2002). In setting forth the claim, a plaintiff must make an "effort to provide some details of time and place and the alleged effects of the conspiracy…" *Ivery v. Baldauf*, 284 F.SUpp.3d 426, 439 (W.D.N.Y. 2018).

Here, plaintiffs allege several "overt acts" allegedly committed by Kadien and/or the DOCCS defendants in furtherance of a conspiracy to deprive Ms. Guardiola of her constitutional rights. However, the bulk of these acts describe conduct that took place independently, by one actor or the other (e.g., Kadien's entry into Guardiola's apartment, the DOCCS defendants' origination of the 9-1-1 call), without any factual or logical connection to other actors. The only acts attributed to both Kadien and the DOCCS defendants consist of "jointly" devising a false, exculpatory version of the events surrounding Guardiola's death, and thereafter submitting false reports and testimony to promote it. (Dkt. #1 at ¶¶123-130).

Plaintiffs do not allege any specific meeting of the minds. They fail allege that Kadien and the DOCCS defendants knew or communicated with one another. In sum and substance, their conspiracy claim amounts "only [to allegations] that [d]efendants jointly filed a false report." *Khan v. City of New York*, 2016 U.S. Dist. LEXIS 16558 at *28-*29 (E.D.N.Y. 2016)(dismissing conspiracy claim as insufficiently stated).

Because plaintiffs do not allege that any communication, meeting of the minds or cooperative effort took place between Kadien and the DOCCS defendants that might lend plausibility to their allegations that Kadien conspired together with the DOCCS defendants to deprive Guardiola of her constitutional rights, their conspiracy claim against Kadien is dismissed.

## IV. Third Cause of Action: *Monell* Claim and Violation of the New York State Constitution against the City of Canandaigua

It is well established that "[t]here is no respondeat superior liability under §1983." *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996). As such, municipal defendants cannot be held liable based on the mere fact that one or more of their employees allegedly violated the plaintiff's civil rights. Rather, to succeed on a claim against a municipality, the plaintiff must show that "the alleged unlawful action [was] implemented or was executed pursuant to a governmental policy or

custom." *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). The governmental policy or custom may have been formally enacted by lawmakers, or established by so-called "policymakers," i.e., government officials whose edicts or acts may fairly be said to represent official policy. *Id.*, 436 U.S. 658 at 694.

Here, plaintiffs allege that the City developed and maintained customs, policies and practices that included inadequate screening of officers with respect to their propensity for violence, and a culture of indifference with respect to warrantless intrusions into residences and the constitutional rights of individuals subject to welfare checks. (Dkt. #1 at ¶¶131-38). They further allege that these customs, policies and practices were expressly ratified by Chief Hedworth when he stated at an April 2, 2018 press conference that Kadien's conduct in entering Guardiola's apartment without a warrant and using lethal force against her "was within the policies and procedures of our department." (Dkt. #1 at ¶¶108-14).

The City argues that plaintiffs have failed to allege that the City condoned any other specific unconstitutional welfare checks, or that the City was deliberate in its indifference to constitutional rights. Rather, the City argues that plaintiffs have alleged only "an isolated incident by an employee under policymaking level," and have not alleged that the City ever "ratified" that employee's conduct. (Dkt. #45-4 at 8-9).

A.     **Ratification**

With respect to Hedworth's public statements, when a plaintiff asserts a *Monell* claim on the basis of a single municipal employee's conduct, rather than on the basis of a city-wide policy or practice, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). The acts of an official with final policy-making authority are

deemed to meet that test. *See id.* "[E]ven a single action" by a final policymaker "is sufficient to implicate the municipality in the constitutional deprivation for the purposes of §1983." *Id.* The Second Circuit has also recognized that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). *See also Lewis v. City of New Haven*, 2017 U.S. Dist. LEXIS 3649 at \*10-\*11 (D.Conn. 2017).

Plaintiffs have plausibly alleged that Hedworth, as the Police Chief for the City, was a final policymaker for purposes of the relevant events, to the extent that he had the authority to train, supervise and/or discipline Kadien, and to enforce policies and procedures for the sheriff's department.

However, plaintiffs have not plausibly alleged that the unconstitutional conduct which Hedworth ratified was part of "a pattern of constitutionally offensive acts," rather than an isolated event. In order to state a claim for ratification of repeated unconstitutional acts, there must be "well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers": a "single instance" of ratification is insufficient. *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 287 n.3 (D.Conn. 2015)(quoting *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983)). *See also Deferio v. City of Syracuse*, 770 Fed. Appx. 587, 591 (2d Cir. 2019) (holding that a *Monell* claim premised on ratification requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(unpublished opinion)(quoting *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980)).

14

Here, although plaintiffs make the conclusory allegation that the sheriff's department routinely conducts unconstitutional warrantless welfare checks, plaintiffs do not identify any such checks, describe when they occurred, or identify any additional representations by Hedworth or other policymaking officials that ratified, rewarded, or systematically failed to mete out discipline with respect to them. Plaintiffs' *Monell* claim against the City, to the extent it is premised on a ratification theory, is therefore dismissed.

### B.  Acquiescence

"[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under §1983.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal citation omitted)). To prove such deliberate indifference, plaintiffs must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton*, 489 U.S. 378 at 390. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations [and] deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)).

As with the portion of their *Monell* claim premised on ratification, plaintiffs have not plausibly alleged a pattern of incidents, or complaints concerning such incidents, that would have informed the City of an "obvious need" to supervise and protect against unconstitutional conduct. Their *Monell* claim based on an acquiescence theory is accordingly dismissed.

### C.        Failure to Train

Liability based on a failure to train is the most tenuous form of municipal liability under *Monell*. *See Lewis*, 2017 U.S. Dist. LEXIS 3649 at *16-*17. As with the "acquiescence" theory discussed above, a failure to train claim requires an allegation that the municipality showed deliberate indifference to the risk that civil rights would be violated by the lack of training. Courts in the Second Circuit have articulated the elements of deliberate indifference for such a claim as follows:

> (1) a policymaker knows to a moral certainty that [his] employees will confront a given situation; (2) the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id*. (quoting *Jones v. City of New York*, 2016 U.S. Dist. LEXIS 44609 at *26 (S.D.N.Y. 2016)).

Deliberate indifference may therefore be found where "city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Notice is generally established by alleging a pattern of similar violations; however, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *id*. at 63 (internal quotation marks omitted), such as where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. 378 at 390.

Here, plaintiffs have not alleged a pattern of specific, pre-existing violations. Their claim of deliberate indifference to the need to train police officers with respect to warrantless entries into private residences relies upon the single incident that resulted in Guardiola's death. To hold the

16

City liable under Section 1983 based solely on this event, "the unconstitutional consequences of failing to train" must have been "patently obvious" and an actual violation of constitutional rights must have been a "highly predictable consequence" of the failure to train. *Connick*, 563 U.S. 51 at 64. *See Waller*, 89 F.Supp.3d 279, 285 (finding that a claim of failure to train police officers concerning the constitutional limitations on searches of private residences in connection with search warrants concerns an issue where the need for training is so "patently obvious" that a *Monell* failure-to-train claim may be premised on a single incident).

It is axiomatic that police officers are frequently required, in the course of their duties, to make entries onto private property and into private residences, with and without warrants. Indeed, the complaint alleges that the Canandaigua Police Department conducts 20-30 welfare checks per month. (Dkt. #1 at ¶106). The Court accordingly concludes that the need to train police officers about the constitutional limitations involved in executing those duties is "so obvious," and the consequences of deficient training are so likely to result in constitutional deprivations, that the failure to provide sufficient training can be properly characterized as "deliberate indifference" to the constitutional rights of citizens. *See Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 391-92 (S.D.N.Y. 2013)(collecting cases and noting that "courts across the country" have permitted *Monell* failure-to-train claims based on a single incident, where constitutional violations were a "highly predictable consequence").

I therefore conclude that, at the present stage, plaintiffs have plausibly alleged a *Monell* claim based on failure to train.

V.      **Fourth Cause of Action: Governmental Interference With Familial Relationships against the Individual Defendants and the City of Canandaigua**

To state a claim for wrongful governmental interference with family relationships, plaintiffs must allege that the government took action that was "specifically intended to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018).

Plaintiffs have not opposed the motions to dismiss this claim. As such, it is deemed abandoned, and dismissed.

VI.     **Fifth Cause of Action: Denial of Due Process and Unreasonable Search and Seizure in Violation of the New York State Constitution, against Kadien and the DOCCS Defendants**

Kadien argues that to the extent plaintiffs allege that his actions violated the New York State Constitution, those claims are duplicative of plaintiffs' Section 1983 claims, which provide an adequate remedy at law. He therefore argues that they should be dismissed.

Plaintiffs concede that the claims overlap, but note that courts in this Circuit have typically held that "the more prudent course" in the early stages of a lawsuit is to deny motions to dismiss parallel state law claims, as they will succeed or fail together with the federal causes of action in any event. *Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735 at *257 (S.D.N.Y. 2011).

The Court sees no reason not to follow this well-settled precedent. Defendants' motion to dismiss plaintiffs' parallel state claims is therefore denied.

VII.    **Sixth Cause of Action: Assault and Battery against Kadien**

To state a claim for assault, plaintiffs must allege that the defendant engaged in "physical conduct placing the [victim] in imminent apprehension of harmful contact [i.e., a battery]." *Gould v. Rempel*, 99 A.D.3d 759, 760 (N.Y. App. Div. 2d Dep't 2012). The standards for assessment of a state law assault and battery claim are "substantially identical" to those for excessive force. *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991).

For the same reasons discussed above with respect to plaintiffs' excessive force claims, the Court finds that the complaint plausibly states a claim for assault and battery.

Kadien suggests that due to Guardiola's death, it is impossible to know (and thus, impossible for plaintiffs to plausibly allege) whether Guardiola had been placed "in imminent apprehension of harmful conduct" at the time she was shot. However, the Court finds that the complaint's averments concerning Guardiola's conduct contain sufficient indicia of such "apprehension" to state a plausible claim. Specifically, plaintiffs allege that Guardiola was awakened by an unknown man entering her bedroom, and reacted by reaching for her service weapon. Those allegations, if proven, could well persuade a reasonable trier of fact that Guardiola believed (as it turned out, correctly), that she was in danger of imminent harm at that moment.

Kadien's motion to dismiss plaintiffs' assault and battery claims is denied.

## VIII.   Tenth Cause of Action: Wrongful Death against all Defendants

"To state a claim for wrongful death in New York, a plaintiff must allege, inter alia, the survival of a distributee who suffers pecuniary loss on account of the decedent's death, and the appointment of a personal representative for the decedent." *Singleton v. City of Newburgh,* 1 F. Supp.2d 306, 317 (S.D.N.Y. 1998).

Defendants argue that plaintiffs have failed to present evidence of pecuniary loss. The City defendants further argue that plaintiffs have not made sufficient factual allegations against Hedworth to impute liability for Guardiola's death to him, and thus to the City. *See generally Baez v. City of Rochester*, 2016 U.S. Dist. LEXIS 76421 at *9 n.2 (W.D.N.Y. 2016)("unlike federal civil rights actions, municipal liability under the theory of respondeat superior may apply in New York wrongful death actions").

Plaintiffs note that at the motion to dismiss stage, plausible allegations of pecuniary harm are sufficient and that proof is not necessary. Moreover, the complaint alleges that after Guardiola was injured, Hedworth arrived at the scene prior to medical first responders, and did not render or call for medical aid, thus contributing to Guardiola's death.

The Court agrees that the allegations of the complaint are sufficient, at this stage, to state claims for wrongful death against the defendants. The defendants' requests to dismiss plaintiffs' wrongful death claim are, accordingly, denied.

## IX.   Eleventh Cause of Action: Conscious Pain and Suffering against the Individual Defendants and the City of Canandaigua

Defendants argue that plaintiffs' cause of action for "pain and suffering" is a damages allegation rather than a cause of action.

Plaintiffs respond that under New York Law, "conscious pain and suffering" is recognized as a separate cause of action that often accompanies a wrongful death claim. It refers to the decedent's injuries, pain and suffering prior to death, and can be brought by the estate. *See e.g.*, *Dershowitz v. United States*, 2015 U.S. Dist. LEXIS 46269 at *104-*105 (S.D.N.Y. 2015). To state a claim for conscious pain and suffering, plaintiffs must allege that the injured party "was conscious for some period of time following the [injury]." *Phillips v. City of Middletown*, 2018 U.S. Dist. LEXIS 163308 at *29-*30 (S.D.N.Y. 2018).

Plaintiffs allege that Guardiola was not pronounced dead until one hour after she was shot, that she was still alive and breathing when first responders arrived, and that one or more officers on the scene had apparently deemed it necessary to handcuff her in the intervening minutes. These allegations plausibly indicate that Guardiola was conscious for a period of time after she was shot. Defendants' motions to dismiss plaintiffs' conscious pain and suffering claim are therefore denied.

**CONCLUSION**

For the reasons stated above, plaintiffs' second cause of action for conspiracy is dismissed as against defendant Kadien. Plaintiffs' third cause of action ("*Monell* claim") against the City is dismissed in part, to the extent that it relies on theories of ratification and/or acquiescence.

Plaintiffs have requested that in the event that any of their claims are dismissed for failure to state a claim, they be granted leave to replead. In light of the Second Circuit's well-known directive that leave to amend be "freely given," that request is granted. If plaintiffs wish to file an Amended Complaint setting forth, in sufficient detail to state a plausible claim, the facts supporting their conspiracy claim, and/or *Monell* claims based on ratification or acquiescence theories, they may do so within twenty (20) days of entry of this Decision and Order.

In light of the settlement of all claims between plaintiffs and the Grand Atlas defendants (Dkt. #71), the motion to dismiss by the Grand Atlas defendants (Dkt. #39) is denied as moot, and plaintiffs' seventh, eighth and ninth causes of action, which were asserted solely against those defendants, as well as plaintiffs' tenth cause of action to the extent it is asserted against the Grand Atlas defendants, are dismissed. Plaintiffs' fourth cause of action for interference with familial relationships is deemed abandoned and withdrawn, and is likewise dismissed, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      January 13, 2021.