UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALYSA OCASIO, ANDREW OCASIO and
JAHAIRA HOLDER, as Administratrix of the Estate
of Sandy Guardiola,

                              Plaintiffs,

                                        DECISION AND ORDER

                                        18-CV-6712DGL

                v.

CITY OF CANANDAIGUA, a municipal entity;
Canandaigua Police Chief STEPHEN HEDWORTH,
in his individual and official capacities; Canandaigua
Police Sergeant SCOTT KADIEN, in his individual
capacity; DOCCS Regional Director GRANT SCRIVEN,
in his individual capacity; DOCCS Parole Chief DAWN
ANDERSON, in her individual capacity; DOCCS Senior
Parole Officer THOMAS O'CONNOR, in his individual
capacity; and DOCCS Senior Parole Officer BETH
HART-BADER, in her individual capacity,

                              Defendants.
_____

      Plaintiffs commenced this action against defendants, the City of Canandaigua, its police chief, a police sergeant, and several employees of the Department of the New York State Department of Corrections and Community Supervision ("DOCCS").[1]

---

[1] The four DOCCS defendants (moving defendants Anderson, Hart-Bader, and O'Connor, and non-moving defendant Scriven, who previously filed a separate motion to dismiss the claims against him, which was denied at Dkt. #227) are the only defendants presently remaining in the case. Plaintiffs' original complaint also asserted claims against the owner, management company, and two staff members of the decedent's apartment complex (collectively "Grand Atlas defendants"), and the City of Canandaigua, its police chief, and a sergeant (collectively "Canandaigua Police defendants). On September 15, 2020, the Court was notified that all claims against the Grand Atlas defendants had been settled through mediation. (Dkt. #71). On September 11, 2023, the Court was notified that the Canandaigua Police defendants had made an offer of judgment of $1,500,000 pursuant to Fed. R. Civ. Proc. 68, which plaintiffs had accepted. (Dkt #231). Judgment was accordingly entered against the Canandaigua Police defendants in that amount, and that judgment has now been fully satisfied. (Dkt. #235, 238).

Defendants Dawn Anderson ("Anderson"), Thomas O'Connor ("O'Connor"), and Beth Hart-Bader ("Hart-Bader") (collectively, "DOCCS Defendants") now move to dismiss the Second Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b)(6). (Dkt. #183). For the reasons that follow, that motion is granted in part, and denied in part.

## FACTUAL BACKGROUND

Plaintiffs Alysia Ocasio and Andrew Ocasio are the heirs, and plaintiff Jahaira Holder is both heir and administratrix, of the estate of decedent Sandy Guardiola ("Guardiola"), who was shot to death in her apartment by City of Canandaigua Police Sergeant Scott Kadien ("Kadien") on the afternoon of October 4, 2017.

According to the Second Amended Complaint (Dkt. #167), Guardiola was a parole officer who had initially been employed by the Rochester DOCCS office, and had complained of race-based harassment from colleagues in that office, which Rochester DOCCS Senior Parole Officer O'Connor, and DOCCS Regional Director Scriven, allegedly allowed to persist. (Dkt. #167 at ¶43). Dissatisfied with the continued harassment, Guardiola eventually requested a voluntary transfer to another office, which was granted, and Guardiola was reassigned to the Binghamton DOCCS office. Just before Guardiola was to start work there, she was involved in a motor vehicle accident, and was home on medical leave from September 4, 2017 through October 3, 2017.

On the afternoon of October 3, 2017, Guardiola spoke on the phone with the Bureau Chief of the Binghamton DOCCS office,[2] and informed him that she was recovering well and waiting for a doctor's note to clear her to return to work.

---

[2] The Binghamton Bureau Chief's name is Patrick O'Connor. To avoid confusion between him and individual defendant (and Rochester Bureau Parole Supervisor) Thomas O'Connor, the Court will refer to Patrick O'Connor by his job title.

2

The following day, the Binghamton Bureau Chief allegedly tried to call Ms. Guardiola and got no answer. He informed Scriven of this. Scriven then contacted O'Connor in Rochester, and directed him to perform a "wellness" check on Guardiola. Plaintiffs allege that during this conversation, the two men conspired to concoct a false story that there was an emergency requiring a wellness check, because Guardiola had not been heard from for three weeks.

Later on the afternoon of October 4, 2017, O'Connor went to Guardiola's apartment complex in Canandaigua, and met with an employee of the complex's management company. After they were unable to determine whether Guardiola was home, O'Connor called 9-1-1 and requested a welfare check on Guardiola, stating that she had been "missing" from work for three weeks.

Canandaigua Police Sergeant Kadien was dispatched to Guardiola's apartment, and met with O'Connor. The Second Amended Complaint alleges that upon information and belief, O'Connor and Kadien discussed the allegations of employment discrimination that Guardiola had made when she worked at the DOCCS office in Rochester, and other matters related to Guardiola's transfer to the DOCCS office in Binghamton. They ultimately agreed that only Kadien would enter Guardiola's apartment, due to this "issue" between Guardiola and O'Connor's office. (Dkt. #167 at ¶9).

At Kadien's request, building management staff escorted him to Guardiola's apartment and unlocked it for him. Kadien entered the apartment, opened the closed door to Guardiola's bedroom, and shot Guardiola in the right arm, head, and abdomen. Thereafter, Kadien called for backup. After other law enforcement personnel arrived, plaintiffs alleged that the police officers conspired to "cover up Kadien's actions" for approximately 10 minutes, before calling emergency responders. (Dkt. #167 at ¶11). Guardiola succumbed to her injuries a short time later.

This action followed. The Second Amended Complaint asserts several causes of action against the DOCCS defendants, including unlawful search and seizure, excessive force, conspiracy to violate constitutional rights, wrongful death, and conscious pain and suffering. (Dkt. #167).

## DISCUSSION

**I.      Relevant Standard**

On a motion to dismiss under Rule 12 (c), courts "employ the same standard applicable to Rule 12(b)(6) motions to dismiss." *Montgomery v. NBC TV*, 2020 U.S. App. LEXIS 35731 at *2 (2d Cir. 2020)(unpublished opinion)(quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015)(internal quotation marks and alterations omitted)).

The Court's task is thus to determine whether, "accept[ing] the allegations contained in the complaint as true, and draw[ing] all reasonable inferences in favor of the non-movant," plaintiffs have stated a facially valid claim. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). In order to be found sufficient, a pleading must set forth sufficient facts to suggest that a cause of action is legally plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Ultimately, where a plaintiff has not "nudged their claim[] across the line from conceivable to plausible, their complaint must be dismissed." *Id*.

Further, the "Court has discretion to dismiss claims *sua sponte* pursuant to Rule 12(b)(6), particularly where it is clear that a plaintiff could not have prevailed on the facts as alleged." *Bailon v. Presents*, 2023 U.S. Dist. LEXIS 16915 at *27 (S.D.N.Y. 2023).

**II.     First Cause of Action: Violation of the Fourth and Fourteenth Amendments (42 U.S.C. §1983)**

    **A.     Unlawful Entry - Standard**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). It is thus a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 749.

In order to overcome this presumption, the warrantless entry of a home must fall under a relevant exception, such as the "exigent circumstances" or "emergency aid" doctrine, which excuses a warrantless entry "if law enforcement has probable cause to believe that a person is 'seriously injured or threatened with such injury.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020)(quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Police officers seeking to apply the doctrine bear a heavy burden to demonstrate that "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *Chamberlain*, 960 F.3d 100 at 106 (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)).

    **B.     Excessive Force – Standard**

The standard for assessing a claim of excessive force under the Fourth Amendment is one of "objective reasonableness," which "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Fresh*water, 623 F.3d 90, 96 (2d Cir. 2010).

Three primary considerations guide consideration of an excessive force claim: (1) the nature and severity of the action that precipitated the use of force (e.g., in circumstances involving

an arrest, this generally refers to the nature and severity of the crime precipitating the arrest); (2) whether the individual against whom force was used posed an immediate threat to the safety of the officer or others; and (3) whether the individual was actively resisting arrest or attempting to flee. *See Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015).

### C. Plaintiffs' Specific Section 1983 Claims Against the DOCCS Defendants

Initially, the DOCCS defendants argue that plaintiffs have failed to state Fourth Amendment claims for excessive force, unlawful entry, or unreasonable search and seizure against the DOCCS defendants, because it was Kadien – and not any of the DOCCS defendants – who initially entered Guardiola's apartment, and used force against her.

With respect to Anderson and Hart-Bader, the Court agrees. Although plaintiffs allege that Anderson and Hart-Bader "instigated" the wellness check on Guardiola in an unspecified way, plaintiffs allege no facts plausibly connecting Anderson or Hart-Bader to it: only Scriven and O'Connor are alleged to have communicated with one another concerning O'Connor's visit to Guardiola's apartment and his 9-1-1 call requesting the welfare check. As such, plaintiffs' Section 1983 constitutional claims against Anderson and Hart-Bader, however characterized,[3] must be dismissed in their entirety.

For the same reasons, the Court dismisses, *sua sponte*, plaintiffs' constitutional claims against Scriven. While plaintiffs contend that Scriven instructed O'Connor to go to Guardiola's apartment and check on her, they do not plausibly allege that Scriven was personally involved,

---

[3] The Second Amended Complaint alleges multiple violations of the Fourth and Fourteenth Amendments: violation of the right to privacy, the right to be free from unreasonable search and seizure, the right to be free from excessive force, the right to due process, and the right of free association. (Dkt. #167 at ¶146). The DOCCS' defendants' arguments only appear to attack the legal sufficiency of plaintiffs' Fourth Amendment claims of unreasonable search and seizure, unlawful entry, and excessive force: however, the Court finds that plaintiffs' allegations are insufficient to state plausible constitutional claims against Scriven, Anderson and/or Hart-Bader under any theory.

either directly or indirectly, in any of the alleged constitutional violations by Kadien. Plaintiffs' Fourth and Fourteenth constitutional claims against Scriven are accordingly dismissed.

With respect to O'Connor, the moving defendants argue that O'Connor cannot be held liable for unlawful entry into Guardiola's apartment, unreasonable search and seizure, or excessive force, because even though O'Connor went to Guardiola's apartment complex and summoned Kadien to enter it, O'Connor did not personally enter the apartment himself until after Guardiola was shot. Defendants also suggest that O'Connor was not acting under "color of law" in his capacity as a Senior Parole Officer at the time he requested the welfare check, but was simply "acting as a co-worker." (Dkt. #183-2 at 10.)

Initially, I find that plaintiffs have plausibly alleged that O'Connor was acting under color of law at or around the time he requested the welfare check. Even though O'Connor had not been an office "coworker" of Guardiola's for weeks, he traveled to Guardiola's apartment during the workday, at his superior's behest, and identified himself as a parole officer to Kadien, and the apartment complex staff. Plaintiffs' allegations that Kadien and O'Connor discussed whether O'Connor should enter the apartment to assist Kadien with the welfare check, rather than remain outside (which they eventually decided O'Connor should do, in deference to the "issue" between Guardiola and O'Connor's office, and not because of any concern that O'Connor lacked the legal right to enter Guardiola's apartment), further suggests that O'Connor was not acting or being treated as a private citizen, but as a fellow member of law enforcement, possessed of equal authority to enter Guardiola's home. (Dkt. #167 at ¶9). O'Connor also alleged, as an affirmative defense to the plaintiffs' initial pleading, that he was at all relevant times acting in the lawful exercise of his discretion as a parole officer. (Dkt. #26 at 3-4). I therefore conclude that plaintiffs

7

have plausibly alleged that O'Connor was acting under color of law with respect to the conduct set forth in the Amended Complaint.

Concerning O'Connor's role in the alleged unlawful entry and unreasonable search and seizure, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The Second Circuit has interpreted personal involvement to include "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *accord Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). Moreover, liability may be found against "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect' – *such as [by] ordering or helping others to do the unlawful acts*." *Provost*, 252 F.3d 146 at 155 (emphasis added).

In order for liability to attach under an "indirect involvement" theory based on, e.g., the knowing transmission of false information by or between law enforcement, a defendant's "indirect role in bringing about the [constitutional violation] violate[s] the [Constitution] only if, at the time [the defendant] transmitted the information, [the defendant] *knew* that their conduct was depriving Plaintiff of his [or her] rights under the [Constitution], or causing those rights to be deprived." *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 177 (D. Conn. 2015).

The Court remains mindful of its obligation, on a motion to dismiss, to accept the allegations contained in the Second Amended Complaint as true and draw all reasonable inferences in favor of plaintiffs. Here, plaintiffs plausibly allege that O'Connor had actual knowledge that the situation at Guardiola's apartment was not urgent, and was aware that he had not made all

reasonable efforts to check on Guardiola (e.g., he had not attempted to call her emergency contacts), at the time he called 9-1-1 to request a welfare check by police. They claim that O'Connor nonetheless did so, for the purpose of using that unconstitutional intrusion as a tool of harassment. Plaintiffs thus claim that O'Connor had not only the actual knowledge, but the specific intent, to direct and cause a violation of Guardiola's constitutional rights against unlawful entry and unreasonable search and seizure. *See e.g.*, *Duncan v. City of New York*, 2016 U.S. Dist. LEXIS 136340 at *23 (E.D.N.Y. 2016)(an officer may be held liable for an unlawful seizure even if he "t[ook] part in less direct ways" than directly seizing the individual). I therefore find that plaintiffs have plausibly alleged that O'Connor, acting under color of state law, "directly and intentionally applie[d] the means by which another [wa]s seized in violation of the Fourth Amendment," and decline to dismiss plaintiffs' claims of unreasonable search and seizure, or unlawful entry, against him. *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 1999).

I reach a different conclusion with respect to plaintiffs' claims of excessive force against O'Connor. While O'Connor's "reckless" communication of "inflammatory and inaccurate information" may have heightened the chance that Kadien's entry into Guardiola's apartment could result in an excessive use of force, plaintiffs have not plausibly alleged that O'Connor had actual knowledge that it would, or that he otherwise directed or assisted Kadien to use force against Guardiola. *Gothberg*, 148 F. Supp. 3d 168 at 177)(dismissing Fourth Amendment claims against Southington police officers who "reckless[ly] communicat[ed] inflammatory and inaccurate information" about the plaintiff to Plainville police, who then engaged in excessive force against the plaintiff, because "[w]hile [the Southington] officers may have suspected" that the false information would increase the likelihood that excessive force would be used by the Plainville police, the "fact that the alleged transmission of that information occurred before [the] excessive

9

force precludes the conclusion that the [Southington officers] had actual knowledge that their conduct was violating Plaintiff's [Constitutional] rights"). Plaintiffs' excessive force claims against O'Connor are accordingly dismissed.

### III. Second Cause of Action: Conspiracy to Violate the Fourth and Fourteenth Amendments, As Asserted Against Anderson, O'Connor, Hart-Bader, and Scriven

In order to state a claim for conspiracy under Section 1983, a plaintiff must allege: (1) an agreement between two or more actors (at least one a state actor); (2) to act in concert to cause an unconstitutional injury; and (3) an overt act done in furtherance of that agreement, causing damages. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). In setting forth the claim, a plaintiff must make an "effort to provide some details of time and place and the alleged effects of the conspiracy…" *Ivery v. Baldauf*, 284 F.Supp.3d 426, 439 (W.D.N.Y. 2018).

Here, plaintiffs allege that Scriven, Anderson, Hart-Bader, O'Connor, and ultimately Kadien, conspired and agreed to bring about the welfare check on Guardiola, to harass and punish her for having complained about harassment in the DOCCS Rochester office, and/or for having obtained a transfer elsewhere. Finding that there was no plausible allegation of a "communication, meeting of the minds or cooperative effort" between Kadien and any other defendant, this Court previously dismissed plaintiffs' conspiracy claims against Kadien. (Dkt. #82 at 12).

With respect to Anderson and Hart-Bader, plaintiffs do not allege any specific meeting of the minds, or explain exactly what they allegedly agreed to do in order to bring about the welfare check on Guardiola. Indeed, Anderson and Hart-Bader are not alleged to have undertaken any particular actions whatsoever with respect to the welfare check. Plaintiffs' conspiracy claims against them are therefore insufficiently stated, and must be dismissed.

As for O'Connor and Scriven, plaintiffs allege that: (1) Scriven "directed . . . O'Connor to conduct the wellness check" at Guardiola's apartment, and in the course of that conversation, the

two concocted a false story that Guardiola "had not been heard from for three weeks to induce the local authorities to conduct the welfare check" (Dkt. #167 at ¶82); (2) about 20 minutes after arriving at Guardiola's apartment complex, and without attempting to call either of Guardiola's emergency contacts, O'Connor called 9-1-1 and requested that law enforcement conduct a welfare check, falsely indicating that Guardiola had been unaccounted-for for three weeks; and (3) although O'Connor's and Scriven's motive for such a conspiracy is "not fully known at this time," it may have been an extension of the "pattern of harassment" against Guardiola by O'Connor's office, which had been the basis for her transfer request. (Dkt. #167 at ¶¶85-87).

The Court has already determined that plaintiffs plausibly alleged that O'Connor was acting under color of law – and thus, was a state actor for purposes of their conspiracy claim. Nonetheless, taken as true, plaintiffs' allegations do not plausibly state that O'Connor and Scriven conspired together to violate Guardiola's constitutional rights. Specifically, plaintiffs' allegation that Scriven's instruction to O'Connor – to conduct a welfare check *himself* on a false pretense – was simultaneously intended "to induce the local authorities" to engage in an unconstitutional intrusion, while not "logically inconsistent with the possibility of such a conspiracy," is unsupported by any factual allegations that raise it to the level of plausibility. *Perez v. New York City Dep't of Corr.*, 2012 U.S. Dist. LEXIS 121440 at *16 (E.D.N.Y. 2012)(dismissing conspiracy claim based on conclusory and speculative allegations)(quoting *Tolliver v. Ercole*, 2010 U.S. Dist. LEXIS 29683 at *12 (S.D.N.Y. 2010)(dismissing conspiracy claim based on allegations that a physical meeting between two defendants just prior to an allegedly unconstitutional hearing delay indicated a meeting of the minds)). Similarly implausible is plaintiffs' contention that it is "reasonable" to infer that Guardiola's complaints about O'Connor's office would have motivated not just O'Connor, but Scriven, to partake in an explicit plot to violate her constitutional rights.

(Dkt. #166 at ¶87). In short, plaintiffs' allegations that Scriven's intent in sending O'Connor to Guardiola's apartment went beyond causing Guardiola annoyance, and extended to a conspiracy with O'Connor to punish Guardiola for her complaints about O'Connor's office and violate her constitutional rights through manipulation of the "local authorities," are too conclusory and speculative to nudge them from conceivable to plausible. Whatever O'Connor's individual plan or motivation might have been, plaintiffs have not plausibly alleged that Scriven shared it, or that the two otherwise engaged in a meeting of the minds.

Plaintiffs' conspiracy claims against O'Connor (and by logical extension, non-moving defendant Scriven, as he is the only remaining defendant against whom the claim is alleged) are insufficiently stated, and are therefore dismissed.

## IV. Sixth Cause of Action: Wrongful Death as Asserted Against Anderson, O'Connor, Hart-Bader, and Scriven

To state a claim for wrongful death in New York, a plaintiff must allege: "(1) the death of a human being; (2) a wrongful act, neglect[,] or default of the defendant that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal representative of the decedent." *Schmelzinger v. City of Buffalo*, 2024 U.S. Dist. LEXIS 42026 at *13-*14 (W.D.N.Y. 2024)(quoting *Matthias v. United States*, 475 F. Supp. 3d 125, 143 (E.D.N.Y. 2020)).

"In determining causation in wrongful death actions, New York courts look to whether the alleged [act or omission] proximately caused the death." *Mellin v. Nerai LLC*, 2024 U.S. Dist. LEXIS 43471 at *9 (S.D.N.Y. 2024). "A defendant's [wrongful act, negligence, or default] qualifies as a proximate cause where it is a substantial cause of the events which produced the injury." *Id*. (quoting *Mazella v. Beals*, 27 N.Y.3d 694, 706 (N.Y. Ct. App. 2016). As such, "the most significant inquiry in the proximate cause analysis is often that of foreseeability." *Mellin*,

12

2024 U.S. Dist. LEXIS 43471 at *9 (quoting *Hain v. Jamison*, 28 N.Y.3d 524, 530 (N.Y. Ct. App. 2016)). Where there is an intervening act by a third person between the defendant's conduct and the decedent's injury "the causal connection is not automatically severed," and "liability turns on whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [conduct]." *Mazella*, 27 N.Y.3d 694 at 706 (quoting *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315 (N.Y. Ct. App. 1980)).

The DOCCS defendants implicitly concede that plaintiffs have alleged Guardiola's death, the survival of her distributees, and the appointment of a representative. However, they argue that plaintiffs have not alleged any facts sufficient to suggest any of the moving defendants' liability for Guardiola's death.

As to Anderson and Hart-Bader, plaintiffs have once again not plausibly alleged that Anderson or Hart-Bader planned, knew about, condoned, or otherwise took any action whatsoever with respect to the welfare check on Guardiola that resulted in her death. As such, plaintiffs' wrongful death claims against them are dismissed.

Plaintiffs' wrongful death claims against Scriven are likewise dismissed, *sua sponte*. Plaintiffs allege only that Scriven dispatched O'Connor to Guardiola's apartment, with the alleged intent of harassing her through a prospective welfare check by "local authorities": he is not alleged to have undertaken any actions that directly or proximately caused Guardiola's death, and as such, plaintiffs have not plausibly stated a wrongful death claim against him.

With respect to O'Connor, plaintiffs allege that O'Connor called 9-1-1 to request a welfare check on Guardiola, even though he knew there was no emergency, and was aware that he had not exhausted other reasonable efforts to check on her welfare. Plaintiff's further allege that when Officer Kadien responded, O'Connor informed him that Guardiola was a parole officer who had

13

been involved in a dispute with the Parole office, falsely stated that she had not been heard from in three weeks, and informed Kadien that there was a preexisting interpersonal "issue" between Guardiola and O'Connor's office, which was of such significance that it would be "best" if O'Connor did not enter her apartment to assist Kadien with the welfare check.

While each of these statements by O'Connor foreseeably escalated Kadien's perception of the immediacy of the need to enter Guardiola's apartment, as well as Kadien's assessment of the threat level associated with that entry, plaintiffs have not plausibly alleged that Kadien's use of deadly force was a "normal or foreseeable" consequence of O'Connor's actions. Indeed, plaintiffs allege that O'Connor's motivation for instigating the welfare check was simply to "harass" Guardiola for her complaints about discrimination in the Rochester DOCCS office: plaintiffs do not allege that O'Connor intended for Kadien and Guardiola to be placed in mortal danger, or that Guardiola's tragic death was otherwise a foreseeable consequence of O'Connor's actions. (Dkt. #167 at ¶87). Plaintiffs' wrongful death claim against O'Connor must therefore be dismissed.

V. **Seventh Cause of Action: Conscious Pain and Suffering, as Asserted Against Anderson, O'Connor, Hart-Bader, and Scriven**

Under New York Law, "conscious pain and suffering" is recognized as a separate cause of action that often accompanies a wrongful death claim. It refers to the decedent's injuries, pain and suffering prior to death, and can be brought by the estate. *See e.g.*, *Dershowitz v. United States*, 2015 U.S. Dist. LEXIS 46269 at *104-*105 (S.D.N.Y. 2015). To state a claim for conscious pain and suffering, plaintiffs must allege that the injured party "was conscious for some period of time following the [injury]," *Phillips v. City of Middletown*, 2018 U.S. Dist. LEXIS 163308 at *29-*30 (S.D.N.Y. 2018), or otherwise had "some level of cognitive awareness." *Williams v City of New York*, 71 A.D.3d 1135, 1137 (N.Y. App. Div. 2d Dept. 2010).

Because, as discussed above, plaintiffs have failed to state a cognizable wrongful death claim against Anderson, Hart-Bader, O'Connor, or Scriven, plaintiffs' conscious pain and suffering claims against them must likewise be dismissed.

## CONCLUSION

For the reasons stated above, the moving DOCCS defendants' motion to dismiss (Dkt. #183) is granted in part, and denied in part. All of plaintiffs' claims against Anderson and Hart-Bader are dismissed in their entirety.

Exercising its discretion to dismiss insufficiently stated claims *sua sponte*, the Court likewise dismisses plaintiffs' claims against Scriven in their entirety. Plaintiffs' federal and state constitutional claims of excessive force, wrongful death, and conscious pain and suffering against O'Connor are also dismissed. Plaintiffs' 4th Amendment claims based on alleged unlawful entry and/or unreasonable search and seizure against O'Connor remain.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       March 27, 2024.